1  JAMES C. OTTESON, State Bar No. 157781
   jim@agilityiplaw.com
2  MICHELLE BREIT, State Bar No. 133143
   mbreit@agilityiplaw.com
3  AGILITY IP LAW, LLP
   149 Commonwealth Drive
4  Menlo Park, CA 94025
   Telephone:  (650) 227-4800
5  Facsimile:   (650) 318-3483

6  Attorneys for Defendants
   TECHNOLOGY PROPERTIES LIMITED and
7  ALLIACENSE LIMITED

8  CHARLES T. HOGE, State Bar No. 110696
   choge@knlh.com
9  KIRBY NOONAN LANCE & HOGE
   35 Tenth Avenue
10 San Diego, CA 92101
   Telephone:  (619) 231-8666
11 Facsimile:   (619) 231-9593

12 Attorneys for Defendant
   PATRIOT SCIENTIFIC CORPORATION
13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| ACER, INC., ACER AMERICA CORPORATION and GATEWAY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> TECHNOLOGY PROPERTIES LIMITED, PATRIOT SCIENTIFIC CORPORATION, and ALLIACENSE LIMITED, <br><br> Defendants. | Case Nos.  5:08-cv-00877 <br><br> **DEFENDANTS' OPENING SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF** <br><br> Date:         November 30, 2012 <br> Judge:       Hon. Paul S. Grewal |
| HTC CORPORATION and HTC AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> TECHNOLOGY PROPERTIES LIMITED, PATRIOT SCIENTIFIC CORPORATION and ALLIACENSE LIMITED, <br><br> Defendants. | Case No.  3:08-cv-00882 PSG |

| | |
|---|---|
| BARCO, N.V., | Case No. 3:08-cv-05398 PSG |
|         Plaintiffs, | |
|   v. | |
| TECHNOLOGY PROPERTIES LIMITED, PATRIOT SCIENTIFIC CORPORATION and ALLIACENSE LIMITED, | |
|         Defendants. | |

# Table of Contents

TABLE OF CONTENTS .................................................................................................................. 3

TABLE OF AUTHORITIES ........................................................................................................... 4

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I. LEGAL STANDARDS APPLICABLE TO CLAIM CONSTRUCTION. ........................... 2

II. "INSTRUCTION REGISTER" ............................................................................................ 2

    A. Judge Ware Correctly Construed the Term "Instruction Register." ........................ 2

    B. Claim 1 Requires, and the Specification Describes, Embodiments Where an Instruction Register Stores Fixed-Width Instructions That Do Not Include Right Justified and/or Variable Width Operands. ....................................... 3

    C. Plaintiffs' Proposed Construction Would Vitiate Dependent Claim 7. .................... 5

    D. The Inventors Made No Clear Disavowal During Prosecution of the '749 Patent. ..................................................................................................................... 5

III. "RING OSCILLATOR" ....................................................................................................... 7

    A. Judge Ware Correctly Found the Plain and Ordinary Meaning of "Ring Oscillator" Is "Interconnected Electronic Components Comprising Multiple Odd Numbers of Inverters Arranged in a Loop." ...................................... 7

    B. The Examiner's Interview Summary Does Not Constitute a Clear Disavowal by the Applicant that Would Support a Negative Limitation. ................. 8

        The Oscillator of Talbot Does Not Require Multiple Odd Numbers of Inverters to Oscillate. ............................................................................................ 10

        Schmitt Triggers and Inverters Are Structurally and Operationally Different ........ 12

CONCLUSION ............................................................................................................................. 12

# Table of Authorities

**Cases**

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) ................................................................................................................. 7

*Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004) ....................................... 4, 5

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................................... 2, 4, 5

*Sandisk Corp. v. Kingston Technology Co., No.* 2011-1346 (Fed. Cir. Oct. 9, 2012) ...................... 5

*Sealant Systems Intern., Inc. v. TEK Global S.R.L.*, 2012 Markman 3763794, \*1, 2012 WL 3763794 (N.D. Cal. 2012) ............................................................................................................ 2

*Tech. Properties Ltd. v. Matsushita Elec. Indus. Co., Ltd.*, 514 F. Supp. 2d 916 (E.D. Tex. 2007) ................................................................................................................................ 11, 12

*Tech. Properties Ltd., Inc. v. Arm, Ltd.*, 276 Fed.Appx 1019 (Fed. Cir. 2008) .............................. 11

# Introduction

Declaratory judgment defendants TPL, Patriot and Alliacense (collectively "TPL") respectfully ask the Court to enter their proposed constructions of the terms "instruction register" (appearing in U.S. Pats. 5,440,749 and 5,530,890) and "ring oscillator" (appearing in U.S. Pat. 5,809,336) consistent with the constructions Judge Ware set out in his First Claim Construction Order. As demonstrated in its *Markman* briefing, TPL's constructions adhere to the intrinsic evidence and are supported by the applicable legal authorities that govern claim construction. By contrast, declaratory judgment Plaintiffs' competing constructions improperly incorporate narrowing limitations, either from the specifications of the Asserted Patents or through misapprehension of the prosecution histories.

With regard to the straightforward term "instruction register" in claim 1 of the '749 patent, Plaintiffs seek to import limitations concerning the positioning of operands in the instruction register based upon claim construction of *different* terms ("instruction groups" and "operand") which appear in a *different* patent. Further, to reach the same improper result, Plaintiffs seeks to import into independent claim 1 limitations appearing only in dependent claim 7 of the '749 patent. Plaintiffs' attempt to import this limitation – requiring that the claimed instruction register hold operands only that are right-justified – misapprehends the prosecution history, violates the doctrine of claim differentiation, and would prevent claim 1 of the '749 patent from reading on preferred embodiments. Judge Ware reached the correct result when he recognized that reliance on construction of different terms from a different patent was not pertinent to the construction of the term "instruction register" in claim 1 of the '749 patent.

Plaintiffs also improperly seek to narrow the well-known term "ring oscillator" in claim 1 of the '336 patent by misusing the prosecution history of related patent U.S. Pat. 6,598,148. Specifically, Plaintiffs point to an ambiguous comment made by the examiner in the '148 patent file, which ultimately was not relied upon by either the examiner or the applicant in gaining allowance of the '148 patent. Such uncertain matter cannot and should not provide the basis for drastically narrowing construction of the term "ring oscillator" of the '336 patent. As TPL set

forth in its original claim construction briefing and describes below, the oscillator present in the prior art reference U.S. Pat. No. 4,689,581 ("Talbot") cited by the examiner is not a ring oscillator and on that basis the '148 patent invention was allowed over Talbot.

Pursuant to Judge Ware's request, TPL provides below its additional briefing supporting Judge Ware's constructions for the claim terms "instruction register" and "ring oscillator."

## Argument

### I.   LEGAL STANDARDS APPLICABLE TO CLAIM CONSTRUCTION.

This Court is well-versed in the general principles applicable to claim construction. *Sealant Systems Intern., Inc. v. TEK Global S.R.L.*, 2012 Markman 3763794, *1, 2012 WL 3763794 (N.D. Cal. 2012) ("Seven years after the Federal Circuit's seminal *Phillips* decision, the cannons of claim construction are now well-known even if not perfectly understood by parties and courts alike.")  Where specific claim construction doctrines are applicable, they are set forth in the body of the discussion below.

### II.   "INSTRUCTION REGISTER"

#### A.   Judge Ware Correctly Construed the Term "Instruction Register."

The term "instruction register" was added to claim 1 of the '749 patent during reexamination through a wherein clause.  The relevant portion of the wherein clause reads as follows:

> . . . wherein the microprocessor system comprises an **instruction register** configured to store the multiple sequential instructions and from which instructions are accessed and decoded;

Re-exam '749 patent, 1:57-60 (emphasis added), attached as Exh. 1 to the Declaration of James C. Otteson ("Otteson Decl.").  As Judge Ware correctly found, "[i]n computer systems, the phrase 'instruction register' has a plain and ordinary meaning."  First Claim Construction Order ("FCCO") at 10 (Otteson Decl., Exh. 2).  Judge Ware was also correct that "a person of ordinary skill in the art reading the written description would understand that the inventors are using the

phrase with its plain and ordinary meaning." *Id.*[1] The relevant portion of the specification, for example, reads:

> Instruction register 108 receives four 8-bit byte instruction words 1-4 on 32-bit internal data bus 90.

'749 patent, 7:53-55 (describing FIG. 4) (Otteson Decl., Exh. 1).

This passage clearly shows that the term "instruction register" is used in its ordinary sense to mean a hardware device used to hold an instruction.

### B. Claim 1 Requires, and the Specification Describes, Embodiments Where an Instruction Register Stores Fixed-Width Instructions That Do Not Include Right Justified and/or Variable Width Operands.

Plaintiffs urged Judge Ware to incorporate an additional limitation into the term "instruction register," that would require that the operands contained *within* the "instruction register" be "right-justified." Plaintiffs assert this narrowing of claim 1 is warranted based on a claim construction order issued by Judge Ward of *different* terms ("instruction groups" and "operand") from a *different* patent (related U.S. Pat. 5,784,584). *See* Judge Ward Memorandum Opinion and Order, at 22-24 (Otteson Decl., Exh. 3). The terms construed by Judge Ward do not appear in claim 1 of the '749 patent and Judge Ware correctly declined to import them into his construction of "instruction register" to narrow the term. FCCO at 11 ("However, unlike Claim 29 of the '584 Patent, Claim 1 of the '749 patent does not contain such phrases. Thus, the Court does not find Judge Ward's construction pertinent.") (Otteson Decl., Exh. 2).

Not only is the construction of the terms "instruction groups" and operand" not pertinent to claim 1 of the '749 patent, but if Plaintiffs' proposed construction were adopted it would

---

[1] Judge Ware found that "instruction register" should be given its plain and ordinary meaning, citing portions of the '749 patent specification, requiring the instruction register be capable of storing *instructions*. However, it is noted that Judge Ware also cited the *Microsoft Computer Dictionary*, fifth edition, 2002, which indicates that an instruction register is required to instead hold the *address* of the next instruction ("register in a central processing unit that holds the address of the next instruction to be executed."), rather than the *instruction*, which is clearly stated by the specification. Thus, the *Microsoft Computer Dictionary* definition appearing in the FCCO appears inconsistent with the plain and ordinary meaning indicated by Judge Ware when referring to the citation from the patent specification.

1  exclude embodiments disclosed in the '749 patent.  Claim 1 of the '749 patent requires a "bus
2  having a width at least equal to a number of bits in each of the instructions times a number of the
3  instructions fetched in parallel."  Re-exam '749 patent, 1:40-42.  (Otteson Decl., Exh. 1).  A bus
4  that has a width that is a multiple of *the* instruction width means that the instructions have a
5  particular width.[2]

6        Plaintiffs' expert witness Dr. David May appears to agree with Judge Ware's
7  understanding of the plain meaning of the term "instruction register," opining that it is
8  "commonly understood as a storage device that is used to hold one or more instructions and to
9  supply those instructions to the circuits of the microprocessor that will interpret and execute
10 them."  Declaration of Dr. David May ("May Decl.") at p. 2, ¶ 7 (Otteson Decl., Exh. 4).  Indeed,
11 nowhere in his declaration does Dr. May offer an alternative definition of instruction register.
12 Instead, he opines about the nature of operands and opcodes – suggesting that "[u]nless these
13 operands are right-justified in the instruction register, the microprocessor circuitry will be more
14 complicated … contrary to the stated aims of the alleged invention of the '749 patent."  That is
15 not a basis to restrict the plain meaning of the term "instruction register."  *See Phillips v. AWH*
16 *Corp.*, 415 F.3d 1303, 1326–27 (Fed. Cir. 2005) (*en banc*) ("We have held that '[t]he fact that a
17 patent asserts that an invention achieves several objectives does not require that each of the
18 claims be construed as limited to structures that are capable of achieving all of the objectives.'"
19 (quoting *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004)).

20       Further, Dr. May's reading of the specification is wrong.  Even if some instructions might
21 require variable width operands, the vast majority do not.  In fact, most of the instructions are
22 simple 8-bit, fixed-width instructions.  As noted above, for example, the specification provides
23 that "[i]nstruction register 108 receives four 8-bit byte instruction words 1-4 on 32-bit internal
24 data bus 90."  '749 patent, 7:53-55.  (Otteson Decl., Exh. 1).  Nothing in this embodiment

---

[2] The reexamined claim 1 also requires that the multiple fetched instructions be supplied, in parallel, to the instruction register during the same memory cycle they are fetched.

requires operands or operands in the instruction register that are right-justified.

### C. Plaintiffs' Proposed Construction Would Vitiate Dependent Claim 7.

Plaintiffs' proposed construction improperly seeks to import into claim 1 the variable-width operand limitations from dependent claim 7.[3] Claim 7 is dependent from claim 1, and adds additional structure to the instruction register that permits decoding of instructions that employ variable-width operands.[4] The doctrine of claim differentiation is at its strongest when the additional limitations proposed to be added to a parent claim appear in a dependent claim. *See, e.g., Sandisk Corp. v. Kingston Technology Co., No*. 2011-1346 (Fed. Cir. Oct. 9, 2012) (Otteson Decl., Exh. 5).  As stated in *Sandisk*:

> Where, as here, the sole difference between the independent claim and the dependent claims is the limitation that one party is trying to read into the independent claim, "the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 910 (Fed. Cir. 2004); see also *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not in the independent claim.").

Slip opinion, at 21.  Plaintiffs' attempt to read limitations appearing in dependent claim 7 into independent claim 1 violates the doctrine of claim differentiation.

### D. The Inventors Made No Clear Disavowal During Prosecution of the '749 Patent.

During the prosecution of the '749 Patent, the examiner wrote the following sentence in his summary of the October 25, 1994 examiner interview: "Claim 1: Operand width is variable & right adjusted."  *See* '749 Prosecution History, Interview Summary, at 1.  (Otteson Decl., Exh. 6).  The term "instruction register," however, did not appear in claim 1 until years later on January 25, 2011, in an amendment during reexamination.  *See* '749 Re-exam Prosecution

---

[3] Patent claim 7 was application claim 11.  At the time of the examiner interview discussed below, claim 11 was word-for-word the same as claim 7 in the original patent.

[4] The doctrine of claim differentiation at a minimum requires a presumption that this additional structure is not required when using only fixed-width instructions that do not employ variable-width operands.

History, Amendment in Response to Advisory Action, at 2 (Otteson Decl., Ex. 7). Therefore, whatever discussion the examiner might have had with the applicant in 1994 regarding operands is irrelevant to the construction of the term "instruction register," which was not part of claim 1 until more than sixteen years later.

In addition, at the time of the 1994 examiner interview, claim 1 was numbered application claim 3, the original claim 1 at that time having been withdrawn. *See* '749 Prosecution History, at 749PH-00274 and 749PH-00288 (Otteson Decl., Exh. 6); Interview Summary, dated 10/25/1994 (Otteson Decl., Exh. 6). Application claim 3 was under final rejection based on the Boufarah reference. As of the date of the interview, application claim 3 did not contain any reference to "instruction register," "operand," or "variable width operand."[5] Therefore, the Examiner's reference to "Claim 1" in the interview summary is clearly a mistake. The examiner was likely referring to application claim 11 (issued claim 7), that depended from application claim 3 and which also was finally rejected over Boufarah, and which did include both "instruction register" and "variable width operands" at the time.[6] Indeed, it is virtually certain the examiner meant to refer to the original claim 11, not the original claim 1, which had been withdrawn at the time. As explained further below, nothing else is consistent with the prosecution history.

In the November 10, 1994 amendment, following the interview, the applicant only added to the original claim 3 the limitation of a push down stack. *See* '749 Prosecution History, at 749PH-00288-89 (Otteson Decl., Exh. 6). Nothing was said about instruction registers or operands. The applicant remarked: "The above changes to claim 3 were discussed at the

---

[5] Claim 3 was, at the time of the interview, word-for-word the same as issued claim 1, save for the push down stack limitations added later.

[6] Claim 11 depended from claim 3. Unlike original claim 3, claim 11 had been amended in an amendment dated July 6, 1993, to describe the apparatus connected to the instruction register that decodes instructions that employed variable width operands. That claim, however, does not mention anything about right justified operands.

interview." *Id*., 291-92.  However, the applicant also remarked: "[A]n alternative amendment to claim 3 [was] also discussed, but those changes will be made in a successor application." *Id*., 292.  It is to be observed that a divisional application directed to decoding instructions that utilize variable-width operands, similar to claim 11, was filed seven months later, on June 7, 1995.  That patent issued as the US Pat. 5,784,584.

On November 29, 1994, the examiner allowed claim 3 as amended, with the addition of the push down stack, and again without any mention of instruction registers or operands, variable width or otherwise, in the independent claim.  '749 Prosecution History, 749PH-00294.  (Otteson Decl., Exh. 6).  Claim 3 of the application then became claim 1.  Because the examiner acquiesced to the claim language chosen by the applicant, namely the addition of the push down stack, the patentee has not disavowed any claim scope with regard to an instruction register, which did not enter the claim until more than sixteen years later.  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004) ("[T]he record finally reflects the examiner's acquiescence to the claim language chosen by the applicant.  This is not clear evidence of the patentee's disavowal of claim scope.").  In no way can this murky and ambiguous record be said to constitute a clear disavowal of claim scope.

## III. "RING OSCILLATOR"

### A. Judge Ware Correctly Found the Plain and Ordinary Meaning of "Ring Oscillator" Is "Interconnected Electronic Components Comprising Multiple Odd Numbers of Inverters Arranged in a Loop."

The term "ring oscillator" appears in claim 1 of the reexamined '336 patent.  The full text of the limitation reads as follows:

> a single integrated circuit including a central processing unit and an entire **ring oscillator** variable speed system clock in said single integrated circuit and connected to said central processing unit for clocking said central processing unit

Re-exam '336 patent, 1:59-63 (emphasis added) (Otteson Decl., Exh. 8).  As Judge Ware correctly found, "one of ordinary skill in the art would understand the phrase 'ring oscillator' to mean: 'interconnected electronic components comprising multiple odd numbers of inverters arranged in a loop." First Claim Construction Order, at 13:20-22 (Otteson Decl., Exh. 2).  This construction substantially mirrors the previous construction found by Judge Ward.  *Id*., n. 30.  FIG. 18,

reproduced below, illustrates a multiple odd number of inverters arranged in a loop.



FIG._18

Inverters work by inverting an input signal – *e.g.*, if the input of an inverter is a logic "1," the output will be a logic "0." This is confirmed by the specification describing operation of the ring oscillator ('336 patent, 16:54 – 17:10; Otteson Decl., Exh. 8)) in conjunction with FIGS. 17-19. Judge Ware's construction is further confirmed through expert testimony. *See, e.g.*, Declaration of Dr. Vojin Oklobdzija ("Oklobdzija Decl."), ¶¶ 6-7 (describing structure and operation of ring oscillators) (Otteson Decl., Exh. 9).

**B. The Examiner's Interview Summary Does Not Constitute a Clear Disavowal by the Applicant that Would Support a Negative Limitation.**

Plaintiffs urge the phrase "ring oscillator" should be given a specialized meaning based on a statement in an examiner's interview summary from the reexamination of a different patent, U.S. Pat. 6,598,148 (the "'148 Patent"). The '148 Patent shares the same specification with the '336 Patent. Both the '148 and '336 patents teach the use of a ring oscillator and a CPU, but while the '148 patent teaches that the majority of the semiconductor substrate is comprising memory, the '336 patent teaches the independently clocked CPU and I/O Interfaces.

In the summary of the interview, the examiner wrote:

> Continuation of Description of the general nature of what was agreed to if an agreement was reached, or any other comments:
>
> Discussed differences in the prior art and the claimed invention. Particularly, the patent owner argued that the references failed to teach of the limitation requiring "said memory further occupying a majority of the total area of said single substrate". The patent owner further pointed out that the reference of May, noted above, describes that the memory can be the largest and densest component on the chip, but this is different than being the "majority of the total area",
>
> ==Continuing, the patent owner further argued that the reference of Talbot does not teach of a "ring oscillator". The patent owner discussed features of a ring oscillator, such as being non-controllable, and being variable based on the environment. The patent owner argued that these features distinguish over what Talbot teaches. The examiner will reconsider the current rejection based on a forthcoming response, which will include arguments similar to what was discussed.==
>
> /Joseph R. Pokrzywa/
> Joseph R. Pokrzywa
> Primary Examiner
> Central Reexamination Unit 3992

See '148 Prosecution History, Interview Summary, dated 2/12/2008 (Otteson Decl., Exh. 10).

Whatever the examiner might have meant by this language, it is far more important to understand what occurred next. As the examiner noted, the February 12, 2008 interview included a discussion of the Talbot reference. The examiner and the patent owner agreed that "[t]he examiner will reconsider the current rejection [premised on Talbot] *based on a forthcoming response*, which will include arguments similar to what was discussed." *Id.* (emphasis added).

Following the interview, patent owners submitted the promised written response, explaining in detail why the '148 Patent was allowable over the Talbot reference. *See* '148 Prosecution History, 148PH-00650 at 11 (Otteson Decl., Exh. 10). Importantly, the patent owner made *no* argument that would support Plaintiffs' proposed negative limitation such as "non-controllable." Instead the patent owner simply argued that the Talbot reference did not teach a ring oscillator. *See id.*; FCCO at 15, n. 36 (Otteson Decl., Exh. 2).

Even more importantly, in an action dated June 25, 2008, the examiner *expressly* accepted the arguments contained in the written response, never mentioning the interview. Specifically, the examiner stated "Patent Owner's arguments, filed 2/26/08 with respect to the rejections [based on Talbot] have been fully considered and are persuasive. Therefore, the rejection … has been withdrawn." *See* '148 Prosecution History, Non-Final Action, dated 06/25/2008 at paragraph 7, page 5 (Otteson Decl., Exh. 10). Whatever "non-controllable" meant to the examiner at the time of the interview, he made no further mention of it in withdrawing

Talbot as a reference.

Before arriving at a final decision on whether to construe the phrase "ring oscillator" as it was understood to one of ordinary skill in the art, Judge Ware asked the parties to elaborate on the question of whether the voltage controlled oscillator of Talbot *is* or *is not* a ring oscillator:

> "On the one hand, the Court has received extrinsic evidence that the voltage-controlled oscillator disclosed in Talbot is a ring oscillator. On the other hand, arguments have been submitted claiming that the voltage-controlled oscillator of Talbot is not a ring oscillator." [FCCO 16:5-8 (Otteson Decl., Exh. 2)]

Thus, Judge Ware asked for supplemental briefs in which "declarants shall fully articulate the technical basis for their opinions with respect to whether the voltage-controlled oscillator disclosed in Talbot is or is not a ring oscillator." *Id.* at 16.

TPL believes this approach is not an appropriate subject for claim construction. The Federal Circuit has never suggested that it is the role of the district court to evaluate the *technical merits* of the applicant's arguments in construing a claim. Were that the case, *every* claim construction proceeding would devolve into a technical review of the merits of the applicant's arguments, and whether the examiner made a mistake in technical judgment in allowing the claim. While an accused infringer may argue for purposes of *validity* that the examiner was mistaken in allowing the claims over a reference, or that an applicant committed *inequitable conduct* in characterizing a reference, the presence or absence of technical merits in an applicant's argument are not a reason to narrow a claim.

Notwithstanding TPL's objections to the legal premise, however, TPL's expert, Dr. Vojin Oklobdzija, has articulated the reasons why the circuit in Talbot is not a ring oscillator in the accompanying declaration. Some of those reasons are summarized below.

### The Oscillator of Talbot Does Not Require Multiple Odd Numbers of Inverters to Oscillate.

As the Court found, one of ordinary skill in the art would understand the phrase "ring oscillator" to mean: "interconnected electronic components comprising **multiple odd numbers of inverters** arranged in a loop." FCCO at 13 (emphasis added) (Otteson Decl., Exh. 2). An example of a ring oscillator is depicted in Fig. 18 of the '336 Patent:



FIG._18

The circuit illustrated in Fig. 3 of Talbot (the "Talbot Circuit"), reproduced below, on the other hand, contains a Schmitt trigger (numbered 52) in place of an inverter.



FIG. 3

The question, then, is whether one of ordinary skill in the art would recognize the Schmitt trigger oscillator of Talbot as a ring oscillator. As will be made clear, not even Plaintiffs' expert would recognize this oscillator as being a ring oscillator because he admits it can oscillate with only the Schmitt trigger. A ring oscillator *requires* three or more inverters to oscillate. It cannot oscillate with only one inverter. *Tech. Properties Ltd. v. Matsushita Elec. Indus. Co., Ltd.*, 514 F. Supp. 2d 916, 926 (E.D. Tex. 2007) *aff'd sub nom. Tech. Properties Ltd., Inc. v. Arm, Ltd.*, 276 Fed.Appx 1019 (Fed. Cir. 2008) (finding that one inverter by itself cannot oscillate). Indeed, as found by Judge Ward in his claim construction order, a ring oscillator *requires* there be multiple inverters, and not just one. Ward Claim Const. Order, at 11 (Otteson Decl., Exh. 3).

**Schmitt Triggers and Inverters
Are Structurally and Operationally Different**

A Schmitt trigger and an inverter are structurally different, and they also differ substantively in operation. First, unlike an inverter, a Schmitt trigger exhibits a "hysteresis" behavior (its output is dependent on both its current state and its previous state). This makes it more stable when the input changes slowly. Wolfe Decl. ¶ 16 (Otteson Decl., Exh. 11). However, it is this very hysteresis attribute that enables the Schmitt trigger oscillator to maintain an oscillating output on its own, without the need for multiple inverters. Oklobdzija Decl. ¶¶ 14-16 (Otteson Decl., Exh. 9); *see also, Matsushita, supra*.

Dr. Wolfe argues that a single inverter with the output connected to the input via a time delay circuit would form an oscillator. Wolfe Decl. ¶ 29.[7] He does not dispute, however, that no such time delay circuit (such as two inverters in series) is needed for a single Schmitt trigger to oscillate by itself. It is this very single-stage ability that removes Talbot from any possibility of being a ring oscillator. *Matsushita, supra* (noting Judge Ward's exclusion of oscillators that could oscillate with only a single inversion stage from being a ring oscillator).

Due to the structural and operational differences between Schmitt triggers and inverters and because the Talbot oscillator does not require a "multiple odd number of inverters" to oscillate, the Talbot oscillator does not meet the definition of "ring oscillator."

## Conclusion

For the foregoing reasons, the Court should adopt Judge Ware's findings in his First Claim Construction Order. First, the term "instruction register" is used in the '749 Patent with its plain and ordinary meaning. FCCO at 10. Therefore, it needs no further construction. *Id*., at 11. Second, one of ordinary skill in the art would understand the phrase "ring oscillator" to mean: "interconnected electronic components comprising multiple odd numbers of inverters

---

[7] If one were to replace the Schmitt trigger of Talbot with an inverter and eliminate the other two inverters, the circuit would not maintain oscillation. In no sense would such a circuit be considered to be an oscillator.

arranged in a loop." *Id.*, at 13.  This term too needs no further construction.

Dated:  October 19, 2012

Respectfully submitted,

AGILITY IP LAW, LLP


By: /s/  James C. Otteson
      James C. Otteson

Attorneys for Defendants
TECHNOLOGY PROPERTIES LIMITED
and ALLIACENSE LIMITED


KIRBY NOONAN LANCE & HOGE


By: /s/  Charles T. Hoge
      Charles T. Hoge

Attorneys for Defendant
PATRIOT SCIENTIFIC CORPORATION